**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SUZANNE B. SMITH,** | **CIVIL ACTION** |
| Plaintiff, | |
| | **No. 21-5473-KSM** |
| *v.* | |
| **COMMONWEALTH OF PENNSYLVANIA,** et al., | |
| Defendants. | |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                                            **August 4, 2022**

*Pro se* Plaintiff Suzanne Smith claims her constitutional rights were violated when she was taken to Montgomery County Emergency Services ("MCES") for mental health screening on a 302 Application[1] submitted by her neighbor, *pro se* Defendant Karen Broadnax.  (*See generally* Doc. No. 1.)  After she was released, Smith filed this case against Broadnax, the Commonwealth of Pennsylvania, Cheltenham Township, MCES, and MCES employee, Tina L. Pergine.  (*Id.*)  Before the Court are motions to dismiss filed by the Commonwealth (Doc. No. 67), the Township (Doc. No. 55), and MCES and Pergine (Doc. No. 70).  Smith opposes these motions (Doc. Nos. 68, 76–78, 80) and has moved to amend her complaint and to add Montgomery County as an additional defendant (Doc. Nos. 49, 59, 60).  In addition, Broadnax has requested appointment of counsel.  (Doc. No. 69.)  For the reasons discussed below, the

---

[1] A 302 Application is an application for emergency medical examination submitted pursuant to § 302 of Pennsylvania's Mental Health Procedures Act (the "MHPA").  50 Pa. Stat. & Cons. Stat. § 7302(a).  The application must set "forth facts constituting reasonable grounds to believe a person is severely mentally disabled and in need of immediate treatment."  *Id.* § 7302(a)(1).

motions to dismiss are granted, Smith's motion to amend the complaint and to add a defendant is denied, Broadnax's request for counsel is denied, and the Court declines to exercise supplemental jurisdiction over the remaining state law claims.

## I.   BACKGROUND FACTS

This case arises out of the less-than-neighborly relationship between Smith and Broadnax, and their interactions in December 2018 and June 2021.  We provide a succinct description of that relationship here.

Smith is a self-described 75-year-old, transsexual, lesbian woman.  (Doc. No. 1 at p. 20.) As early as April 2017, Smith began renting Apartment 9D at the Melrose Station Apartments in Melrose Park, Pennsylvania.  (Doc. No. 44-1 at p. 2; Doc. No. 1 at pp. 11, 13.)  At the time, Broadnax and her family rented Apartment 9B, which is directly below Smith's apartment. (Doc. No. 1 at p. 16.)  According to Smith, "[n]oise coming from the [Broadnax's] apartment [has] continued to be a problem since April, 2018, when the [Broadnax's] purchased a home audio system."  (*Id.* at p. 11.)  For example, in December 2018, Smith heard drumming coming from the Broadnax apartment and knocked on their door to complain.  (*Id.* at pp. 13, 16.)  The Broadnax family called the Township Police Department and reported that Smith had grabbed the doorknob to their apartment and attempted to break in.  (*Id.* at p. 13; *see also* Doc. No. 22 (copy of police report).)

The relationship went downhill from there.  Over the next year and a half, Smith made several noise complaints to management for the apartment complex, and on June 23, 2021, Smith filed a noise complaint with the Township Police Department.[2]  (Doc. No. 1 at p. 11.)  Detective

---

[2] Smith also gave the police the background checks that her private detective ran on the three adult members of the Broadnax family.  (Doc. No. 1 at p. 14.)

Richard Schaffer went to Melrose Station Apartments "to investigate [Smith's] complaint of persistent noise harassment, drumming and other sounds, coming from the Broadnax apartment." (*Id.* at pp. 11, 13.)  The detective's investigation revealed "long standing structural problems in [the] apartment building," which had caused the ceiling to fall down in the Broadnax's apartment and a crack to form between the floor and baseboard in Smith's apartment.  (*Id.* at p. 11.)  These structural issues appear to have exacerbated the noise problem between the two apartments.

Three days later, on June 26, Broadnax filed an application under § 302 of the MHPA (the "302 Application").  (*Id.* at p. 11; *see also* Doc. No. 44-2 at p. 2 (excerpt from 302 Application).)  Broadnax is "a mental health worker at Friends Mental Hospital in Philadelphia" (Doc. No. 1 at p. 11), and in the 302 Application, Broadnax states that she believes Smith "is severely mentally disabled" and "poses a clear and present danger of harm to others or to . . . herself" (Doc. No. 44-2 at p. 2).  Broadnax attests:

> Susanne [sic] Smith has been calling the police and stating we are sending electrical beams through the ceiling to harm her.  Has been recording conversations in my home through a hole in the floor.  Has been standing outside my door listening to us.  Is telling police that we have a private detective watching her.  Was filming me this morning, 6/26/21 as I left for work.  Keeps trying to turn my doorknob.  She does these things after I leave out of my home when my daughter is home alone with her kids.  I work at Friends Hospital and she is having paranoid delusions and I feel that she may act on it.[3]

(Doc. No. 68-2 at pp. 3–4; *see also* Doc. No. 1 at p. 11 (providing excerpt).)  After reviewing Broadnax's Application, Defendant Tina Pergine, the county delegate for Montgomery County, signed a warrant authorizing an involuntary examination of Smith at MCES (the "302 Warrant").  (Doc. No. 68-2 at p. 7.)

---

[3] Smith repeatedly refers to this narrative as "false," "made-up," and "nonsense."  (Doc. No. 1 at pp. 12, 20.)

On June 27 at 9:00 p.m., a Township police officer and MCES personnel tried to serve Smith with the warrant, but Smith, who was in bed at the time, ignored the doorbell and later, the knocking, at her apartment door.  (*Id.* at pp. 13, 15–16.)  The next morning, Smith noticed a voicemail message from the officer, asking her to answer her apartment door and answer a few questions.  (*Id.* at p. 16.)  Smith returned the officer's call and left her own voicemail, but she never received a call back.  (*Id.*)

On June 29 at 9:00 p.m., the officers returned.  This time, three police officers and two MCES employees obtained the key to Smith's apartment from management and "without knocking, forced entry" into her home, "breaking the entry door security chain" in the process.  (*Id.* at p. 13; *see also id.* at p. 20 ("The Apts Manager had given police a key to my apartment; but the inside security chain door jamb screws had been stripped out of the door jamb when the door was forced.").)  Smith, who was in bed at the time and "wearing only a pink pajama top and athletic socks," left her room to investigate the noise.  (*Id.* at p. 16.)  When she saw the officers, she tried to close her door, telling them that she was not dressed, but the closest officer "interposed himself between the door and the door jamb to prevent [her] closing" it.  (*Id.* at p. 17.)  The officer told her that she was sufficiently dressed and that he and the other officers were there to help her.  (*Id.*)  Smith responded that she did not need their help and asked whether they had a warrant.  (*Id.*)

After a slight delay, a "woman not in uniform" showed Smith "what she said was a warrant for [Smith] to be detained for a mental evaluation"; however, Smith denies that she was ever given a copy of the 302 Application or the 302 Warrant.  (*Id.* at pp. 17–18.)  The officers allowed Smith to dress, to print a copy of her resume, and to call her work supervisor to tell him what was happening.  (*Id.* at p. 17 (explaining that she may have also left a voicemail with a law

firm but "cannot remember that part clearly").)  Smith then picked up her keys, phone, identification, and briefcase, and followed the officers out of the apartment.  (*Id*.)  However, one of the MCES employees took her briefcase and phone, saying she "could not keep those."  (*Id*.)

The police officers and MCES personnel escorted Smith to an ambulance, where she was "strapped down to a gurney" and driven to MCES.  (*Id*. at pp. 8, 18 (referring to the hospital as "the infamous 'building 50' state mental hospital in Norristown, PA").)  Once there, Smith was placed in a waiting room, and asked to sign certain papers, including a notice of her constitutional rights.  (*Id*. (explaining that she signed the documents without reviewing them because "[e]verything that was happening to me seemed involuntary anyway"); *see also* Doc. No. 68-2 at p. 7 (affirmation by Deatrice Fields that she "explained [Smith's] rights to him/her" and that she believed Smith "does understand these rights").)  Smith refused, however, to authorize MCES to receive a copy of her medical records.  (Doc. No. 1 at p. 18 (explaining that she denied access because she "DID NOT CHOOSE TO BE THERE IN THE FIRST PLACE AND WOULD NOT EVER TRUST SUCH PEOPLE WHO WERE KIDNAPPING PEOPLE OUT OF THEIR HOMES AND IMPRISONING THEM!").)

A doctor met with Smith, asked her some questions, and read her the narrative from Broadnax's 302 Application.  (*Id*.)  Smith denied Broadnax's allegations, but the doctor told her that it was her word against Broadnax's and that she would need to provide a character reference if she wished to be released.  (*Id*. at pp. 18–19.)  Although it was after 1:00 a.m., staff members were able to get in touch with Smith's work supervisor.  (*Id*. at p. 19.)  The supervisor confirmed that Smith was not a danger to herself or others, and Smith was released; her personal effects were returned to her; and she was allowed to return home.  (*Id.*)

Smith claims this incident has left her in "fear every day . . . that as a transsexual, lesbian woman, I am not safe in the Commonwealth of Pennsylvania" and "could be 302'd in the future." (*Id.* at p. 20.)  She describes feeling guilty and shameful, believes she has lost her self-esteem, and has experienced emotional distress.  (*Id.* at pp. 20–21.)  Last, Smith claims her "Second Amendment rights are [at] risk from possible future PA 302 filings against me."  (*Id.* at p. 21 ("The MCES people say my second amendment rights are not affected because I was not 'admitted' to the MCES Mental Institution; but, I do not trust these people who have no respect for anyone's Federal civil rights.").)  Although she was not admitted at MCES, she claims it was "a close thing," in that "[i]f [her] friend had not answered the blind phone call after 1:00 AM, [she] would have been admitted to the building 50 mental institution and would have lost [her] second amendment rights."  (*Id*.)

## II.    PROCEDURAL HISTORY

On December 14, 2021, Smith filed her initial Complaint against the Commonwealth, the Township, MCES, Pergine, and Broadnax.[4]  (*See generally* Doc. No. 1.)  Her claims are

---

[4] The initial Complaint invokes this Court's federal question jurisdiction.  *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").  The Complaint does not explicitly invoke the Court's jurisdiction on the basis of diversity.  *See* 28 U.S.C. § 1332(a)(1) ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States.").  But even if it had, Smith has failed to allege facts tending to show that diversity is satisfied here.  For one, it is unclear whether Smith is a resident of Pennsylvania (as her allegations and job location suggest) or a resident of New Hampshire (where she identifies her address).  If a resident of Pennsylvania, the complete diversity requirement is not satisfied.  If a resident of New Hampshire, we nonetheless find diversity jurisdiction fails under the amount in controversy requirement.  Once we exclude Smith's requests for damages against the Commonwealth—requests for recovery that fail as a matter of law under the Eleventh Amendment—it is clear that Smith has not alleged any facts tending to show the amount in controversy exceeds $75,000.  To the contrary, Smith seeks a declaration that the MHPA is unconstitutional, an injunction prohibiting the issuance of 302 warrants, an order "expung[ing] all state and Federal records" of the 302 Application and 302 Warrant against her, an order "punish[ing]" the responsible parties, a referral of any criminal violations to the Department of Justice, and reimbursement of $1,016 that MCES charged Smith's insurance company.  Because the Court appears to lack original jurisdiction over the state law claims, jurisdiction over those claims must be premised, if at all, on supplemental jurisdiction.

grounded in 42 U.S.C. § 1983, asserting numerous constitutional violations against all Defendants except Broadnax.  (*See generally id*.)  Smith also claims that the Commonwealth violated her "common law right to refuse medical treatment," that the Township and Pergine acted with gross negligence, and that MCES interfered with a federal official in the performance of her official duties in violation of 18 U.S.C. § 115.  (*Id.*)  As for Broadnax, Smith brings claims for malicious prosecution, abuse of process, filing a false affidavit, and filing a false 302 application.  (*Id.*)

For relief, Smith asks the Court to "strike-down the PA 302 law as being unconstitutional" and to "expunge all state and Federal records of the false PA 302 filed against me."  (*Id.* at p. 22.)  She asks for "punitive compensation [in] amounts sufficiently large that will stop any future 302 warrants from occurring against the plaintiff."  (*Id.*)  She seeks an order requiring MCES to "reverse the false PA 302 billing to my health insurance company . . . for involuntary ambulance 'imprisoned' transportation" in the amount of $1,016.00.  (*Id.* at pp. 22–23.)  Last, she asks the Court to review Third Circuit precedent regarding the constitutionality of the MHPA's "blanket ban on gun ownership of 302 victims" and for us to "refer criminal violations of Federal law contained in this civil filing, by any individuals named in this civil filing, to the U.S. Justice Department for criminal prosecution."  (*Id.* at p. 22.)[5]

The Commonwealth, the Township, and MCES and Pergine have moved to dismiss the Complaint.  Smith opposes those motions and seeks leave to file an amended complaint that adds Montgomery County as a Defendant and adds defamation claims against MCES, Pergine, and

---

[5] Smith also asked for "punitive personal compensation from the Commonwealth of Pennsylvania" and for the Court to order the Commonwealth to set up a trust fund to "compensate victims of the unconstitutional PA 302 law."  (Doc. No. 1 at p. 22.)  Smith has since withdrawn those requests.  (*See* Doc. No. 79-1 at p. 22.)

Broadnax.  Broadnax, who is also proceeding *pro se*, has asked the Court to appoint legal

counsel on her behalf.

## III.   MOTIONS TO DISMISS

We begin with the motions to dismiss.[6]

### A.   *Legal Standard*

The Commonwealth moves for dismissal under Federal Rules of Civil Procedure 12(b)(1)

and 12(b)(5).  (Doc. No. 67 at p. 8.)  The Township, MCES, and Pergine move for dismissal

under Rule 12(b)(6).  (Doc. No. 55 at p. 3; Doc. No. 70 at p. 4.)  Rule 12(b) outlines the defenses

that can be asserted via motion in response to a complaint:

> (b) HOW TO PRESENT DEFENSES.  Every defense to a claim for relief in any pleading
> must be asserted in the responsive pleading if one is required.  But a party may
> assert the following defenses by motion:
>
> (1)  lack of subject-matter jurisdiction;
>
> . . . .
>
> (5)  insufficient service of process;
>
> (6)  failure to state a claim upon which relief can be granted[.]

Fed. R. Civ. P. 12(b)(1), (5), (6).

Rule 12(b)(1) governs jurisdictional challenges to a complaint."  *Williams v. Litton Loan*

*Servicing*, Civil Action No. 16-5301 (ES) (JAD), 2018 WL 6600097, at *5 (D.N.J. Dec. 17,

---

[6] Since filing her initial Complaint (Doc. No. 1), Smith has filed numerous amended pleadings
(*see generally* Doc. Nos. 3, 9, 11, 18, 66, 73, 74, 75, 79, 83).  Many of the amendments correct minor
typographical errors.  (*See* Doc. Nos. 3, 9, 11, 18, 83.)  But the more recent amendments (*see, e.g.*, Doc.
Nos. 66, 73, 79), also make substantive changes, withdrawing requests for damages against the
Commonwealth and adding defamation claims against MCES, Pergine, and Broadnax.  Apart from those
differences, the initial Complaint and the most recently filed amended pleading (Doc. No. 79-1 (the
"Amended Complaint")), are virtually identical.  Because amendment is futile if a claim would be subject
to dismissal under Federal Rule of Civil Procedure 12, the Court finds it prudent to consider Defendants'
arguments for dismissal before turning to Smith's request to add Montgomery County and the defamation
claims.

2018).  "The Court can adjudicate a dispute only if it has subject-matter jurisdiction to hear the asserted claims." *Id.* (quotation marks omitted). "A Rule 12(b)(1) motion may be treated as either a facial or factual challenge to the court's subject matter jurisdiction." *Gould Elec. Inc. v. United States*, 220 F.3d 169, 176 (3rd Cir. 2000).  Here, the Commonwealth asserts a facial attack, meaning it "contests the sufficiency of the complaint because of a defect on its face." *Williams*, 2018 6600097, at *5 (quotation marks omitted).  In reviewing the motion, we consider only the "allegations in the complaint, along with documents referenced therein, in the light most favorable to the nonmoving party," and determine whether they "establish the necessary jurisdiction . . . ." *Myers v. Caliber Home Loans, Seterus, Inc.*, 1:19-cv-596, 2019 WL 4393377, at *3 (M.D. Pa. Sept. 13, 2019).

"Rule 12(b)(5) of the Federal Rules of Civil Procedure permits a motion to dismiss for 'insufficiency of service of process.'" *Mitchell v. Theriault*, 516 F. Supp. 2d 450, 452 (M.D. Pa. 2007).  "In such a motion, 'the party asserting the validity of service bears the burden of proof on that issue.'" *Id.* (quoting *Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 488 (3d Cir. 1993)).  "[T]he court has 'broad discretion' in deciding whether to dismiss the complaint for insufficient service." *Alston v. Markel*, 157 F. Supp. 3d 379, 382 (D. Del. 2016) (quoting *Umbenhauer v. Woog*, 969 F.2d 25, 30 (3d Cir. 1992)).

Last, Rule 12(b)(6) "provides for the dismissal of a complaint if the plaintiff fails to state a claim upon which relief can be granted." *Hoist v. New Jersey*, Civil Action No. 12-cv-5370 (JAP), 2013 WL 5467313, at *4 (D.N.J. Sept. 30, 2013).  Although a plaintiff does not need to include "detailed factual allegations" to survive a Rule 12(b)(6) motion to dismiss, the plaintiff must "provide the grounds of his entitlement to relief" which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp.*

*v. Twombly*, 550 U.S. 544, 555 (2007) (quotation marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555. "In determining the sufficiency of a *pro se* complaint," like the one before us, we "must be mindful to construe it liberally in favor of the Plaintiff." *Hoist*, 2013 WL 5467313, at *4 (citing *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972)).

### B.    Discussion

We begin with the arguments for dismissal raised by the Commonwealth before turning to those raised by the Township and those raised by MCES and Pergine.

### 1.    <u>The Commonwealth</u>

As mentioned above, the majority of Smith's initial Complaint is directed at the Commonwealth of Pennsylvania and challenges the constitutionality of her involuntary commitment pursuant to the MHPA.

The MHPA authorizes the "involuntary examination and treatment" of a person when he or she "is severely mentally disabled and in need of immediate treatment." 50 Pa. Stat. & Cons. Stat. § 7301(a); *see also Doby v. DeCrescenzo*, 171 F.3d 858, 867 (3d Cir. 1999) ("Section 7302 of the MHPA permits the issuance of a warrant for an involuntary emergency examination.").[7] "A person is severely mentally disabled," under the statute "when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or himself." 50 Pa. Stat. & Cons. Stat. § 7301(a). An individual poses a "clear and present danger to others" if in the last 30 days, the person "has

---

[7] Smith suggests we should reconsider *Doby* and "give more weight to the 14th Amendment" because *Doby* "failed to apply Federal civil rights law to all persons equally." (Doc. No. 79-1 at pp. 4–5.) This Court will not do so, as we are *required* to follow Third Circuit published opinions.

inflicted or attempted to inflict serious bodily harm on another and . . . there is a reasonable probability that such conduct will be repeated." *Id.* § 7301(b)(1). And an individual is a "[c]lear and present danger to himself" if in the last 30 days: (1) "the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter or self-protection and safety"; (2) "the person has attempted suicide and . . . there is the reasonable probability of suicide unless adequate treatment is afforded under this act"; or (3) "the person has substantially mutilated himself or attempted to mutilate himself substantially and . . . there is the reasonable probability of mutilation unless adequate treatment is afforded under this act." *Id.* § 7301(b)(2).

In her claims against the Commonwealth, Smith asserts that the MHPA is "unconstitutional and should be struck-down [sic] by this Federal District Court." (Doc. No. 1 at p. 4.) She brings her constitutional claims under 42 U.S.C. § 1983, asserting violations of Articles III, IV, and V of the U.S. Constitution, violations of the Second, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments, and a violation of the "Common Law Right to Refuse Medical Treatment." (*See id.* at pp. 4–7.) The Commonwealth argues that it is immune from suit in federal court under the Eleventh Amendment. (*See generally* Doc. No. 67 at pp. 9– 10.) We agree.[8]

The Eleventh Amendment of the United States Constitution renders unconsenting states immune from private lawsuits in federal court. *See Karns v. Shanahan*, 879 F.3d 504, 512 (3d

---

[8] The Commonwealth also argues that Smith's claims fail because Smith did not properly serve the Commonwealth with the summons and complaint and that it is entitled to sovereign immunity from Smith's claims in any court, not just federal court. (*See generally* Doc. No. 67. at pp. 9–10.) *See Lombardo v. Pa., Dep't of Public Welfare*, 540 F.3d 190, 192–93 (3d Cir. 2008) (holding that "the state sovereign immunity includes both immunity from suit in federal court and immunity from liability, and the state may waive one without waiving the other"). Because we find the Commonwealth immune from suit in this court under the Eleventh Amendment, we need not analyze the propriety of service or the Commonwealth's sovereign immunity arguments.

Cir. 2018) (explaining that the Eleventh Amendment "bar[s] all private suits against non-consenting States in federal court" (quotation marks omitted)); *see also Elman v. United States*, No. Civ.A. 97-5825, 1998 WL 195905, at *1 (E.D. Pa. Apr. 6, 1998) ("The Eleventh Amendment has been consistently interpreted to immunize an unconsenting state from suits brought in federal courts by her own citizens or citizens of another state.").  There are two general exceptions to immunity.  "First, Congress may abrogate Eleventh Amendment immunity by expressing its 'unequivocal' intent to abrogate pursuant to a valid exercise of power." *Lehmier v. Pa. Fish & Boat Comm'n*, Civil Action No. 07-CV-3275, 2008 WL 11498161, at *2 n.2 (E.D. Pa. July 22, 2008) (quotation marks omitted); *see also Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 694 (3d Cir. 1996) ("Congress may specifically abrogate the states' Eleventh Amendment immunity.").  Second, a state may waive its "sovereign immunity and consent to be sued." *Lehmier*, 2008 WL 11498161, at *2 n.2; *see also Blanciak*, 77 F.3d at 694 ("If a state waives its immunity and consents to suit in federal court, the Eleventh Amendment does not bar the action.").

Here, neither exception applies.  First, Congress has not abrogated Eleventh Amendment immunity under § 1983.  Section 1983 creates a private cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.  "[T]he Supreme Court has explicitly held that states are not 'persons' subject to liability under 42 U.S.C. § 1983 in either federal or state forums."[9] *Lehmier*, 2008 WL 11498161, at *2 n.2

---

[9] To the extent Smith brings her "common law right to refuse medical treatment" claim under state law and not § 1983, it is likewise barred by the Eleventh Amendment.  *See Pennhurst State Sch. &*

12

(citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 120–21 (1984) ("[I]f a § 1983 action alleging a constitutional claim is brought directly against a State, the Eleventh Amendment bars a federal court from granting any relief on that claim."); *Blanciak*, 77 F.3d at 697 ("Since Congress expressed no intention of disturbing the states' sovereign immunity in enacting § 1983, these suits, when brought against a state, are barred by the Eleventh Amendment.").  Second, Pennsylvania has declined to waive its Eleventh Amendment immunity.  *See* 42 Pa. Stat. & Cons. Stat. § 8521(b) ("Nothing contained in this subchapter shall be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States.").

Because the Commonwealth is immune from suit, Smith's claims against it are dismissed with prejudice.[10]

## 2.    **The Township**

Next, Smith brings a § 1983 claim against the Township, asserting that the Township acted with "gross negligence" and deprived her of her Fourth Amendment rights.  She argues that the Township police officers erred when they executed the 302 Warrant without first reviewing Broadnax's 302 Application, and, if necessary, investigating the allegations within it. (Doc. No. 1 at pp. 9–10.)  She asserts that the "long standing Township policy . . . where MCES

---

*Hosp.*, 465 U.S. at 120–21 (holding that the Eleventh Amendment also bars "state law claims brought into federal court under pendent jurisdiction").

[10] In the Amended Complaint, Smith withdraws her request for damages as against the Commonwealth, "due to Amendment 11 issue, cannot sue a State for monetary damages."  (*See* Doc. No. 79-1 at p. 22, ¶¶ 3, 5.)  But the Eleventh Amendment bars suits brought by a private plaintiff against a non-consenting state in federal court *regardless of the relief sought.  See Pennhurst State Sch. & Hosp.*, 465 U.S. at 89 ("[I]f a § 1983 action alleging a constitutional claim is brought directly against a State, the Eleventh Amendment bars a federal court from granting *any* relief on that claim." (emphasis added)).

presents to [Township] police . . . a sanitized PA 302 warrant containing only the name and local address of the 302 subject and with a rubber stamped signature of a County Delegate" resulted in the violation of her Fourth Amendment rights. (*Id.* (quoting Fourth Amendment requirement that "no warrant shall issue, but upon probable cause, supported by oath or affirmation").)

As discussed in the previous section, Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983. Unlike the Commonwealth, local governments and municipalities are considered "persons" under § 1983 and may be sued directly under the Act when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978). If, however, the local government is "merely enforcing state law, without adopting any particular policy of its own, it cannot be held liable under the *Monell* line of cases." *Doby*, 171 F.3d at 867.

The Township argues that Smith's claim against it fails because the policy that Smith attacks is nothing more than the Township's enforcement of state law. (Doc. No. 55 at p. 7.) We agree. Smith takes issue with the Township for not requiring its officers to question and investigate 302 warrants before acting on them. Because the "policy" identified is nothing more than the Township's enforcement of the MHPA, Smith's claim must fail. *See Guilday v. Crisis Ctr. at Crozer-Chester Med. Ctr.*, Civil Action No. 21-2010, 2022 WL 612865, at *9 (E.D. Pa. Mar. 1, 2022) ("Because a 30-day warrant validity period tracks the MHPA, there is no evidence that the County Defendants maintained a custom that denied Plaintiff his due process rights.").

14

Moreover, Smith has failed to assert a constitutional violation against the Township under the Fourth Amendment.  Because the MHPA procedures "exist to respond to emergency cases," the Third Circuit has found that a county delegate may issue a 302 warrant "without independent investigation."  *Doby*, 171 F.3d at 872.  It follows that the police officers executing that warrant are likewise not required to perform an independent investigation into the allegations supporting it, so long as it is facially valid.  *Cf. id.* at 871 n.5 ("The MHPA clearly permits seizures of mentally ill individuals without requiring county officials to apply to a magistrate for a warrant that would be issued only upon probable cause.  Instead, the statute creates an alternative warrant scheme.").  Indeed, the MHPA suggests a police department is not permitted to perform an independent examination.  50 Pa. Stat. & Cons. Stat. § 7302(a)(1) ("Upon written application by a physician or other responsible party setting forth facts constituting reasonable grounds to believe a person is severely mentally disabled and in need of immediate treatment, the county administrator may issue a warrant *requiring* a person authorized by him, or *any police officer*, to take such person to the facility specified in the warrant." (emphasis added)).

Smith asserts that the "PA 302 Law states that police 'may' assist but are not required to assist with execution of PA 302 Law warrants."  (Doc. No. 79-1 at p. 10.)  This is incorrect. Section 302(a)(2) outlines the procedures governing "emergency examination without a warrant," and states that a police officer who personally observes "conduct constituting reasonable grounds that [the individual] is severely mentally disabled and in need of immediate treatment . . . *may* take such person to an approved facility for an emergency examination."  50 Pa. Stat. & Const. Stat. § 7302(a)(2).  But here, Smith was taken for examination pursuant to a warrant, so subsection one, *not* subsection two, applies.  And, as mentioned above, § 302(a)(1)

suggests the officer executing the 302 warrant has no discretion, and at least one district court in this Circuit has dismissed Fourth Amendment claims asserted against police officers who executed a 302 warrant. *See Doby v. Decrescenzo*, Civil Action No. 94-3991, 1996 U.S. Dist. LEXIS 13175, at \*83 (E.D. Pa. Sept. 9, 1996) (dismissing false arrest claim because the officers "were serving a facially valid warrant on Rebecca Doby such that they cannot be held liable for a false arrest claim based on the Fourth Amendment")

Because the Township police officers were enforcing state law when they executed the 302 Warrant and were not required to perform an independent investigation before serving that warrant, Smith's claim against the Township is also dismissed with prejudice.

### 3.    MCES

Third, Smith brings multiple causes of action against MCES, the private hospital that received and evaluated Smith on June 29. *See Benn v. Univ. Health Sys., Inc.*, 371 F.3d 165, 168–69 (3d Cir. 2004) (describing "Montgomery County Emergency Service, Inc. ('MCES')" as a "private, not-for-profit psychiatric hospital in Norristown, Pennsylvania, that, by contract, handles all involuntary and emergency psychiatric confinements in the county"). Although her claims are repetitive and difficult to categorize, broadly interpreted, Smith brings § 1983 claims against MCES on the grounds that MCES's "standard for implementing [§] 302 . . . is unconstitutional." (Doc. No. 1 at p. 7.) More specifically, Smith argues that MCES violated her rights when it (1) failed to provide the Township officers with a copy of the 302 Application, (2) transported her to MCES under a defective warrant that was itself based on an inadequate application, and (3) failed to inform Smith of "her common law right to refuse mental diagnostic treatment." (*Id.* at pp. 7–9.) Smith also brings a claim for violation of 18 U.S.C. § 115, arguing that MCES interfered with a federal official in the performance of her official duties when MCES employees took her laptop. (*Id.* at p. 9.)

We begin with Smith's federal claims under § 1983.  As a reminder, § 1983 creates a private cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.  Even broadly interpreted, Smith's § 1983 claims fail because MCES is not a state actor.  *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) ("Our cases have accordingly insisted that the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State."); *Janicsko v. Pellnam*, 774 F. Supp. 331, 339 (M.D. Pa. 1991) ("[T]he complained of action in a § 1983 case must be one that is 'fairly attributable to the state,' and not to some private actor.").  In *Janicsko*, the District Court analyzed at length whether a private hospital is a state actor when it involuntarily commits an individual pursuant to the MHPA.  774 F. Supp. at 335–39.  Finding that the MHPA neither "replaces private physician or facility discretion with state mandated standards," nor "compels or encourages a facility's or physician's actions with regard to involuntary commitment," the Court held that the hospital and its physicians were not state actors and "no cause of action" could be stated against them under § 1983.  *Id.*; *see also Bodor v. Horsham Clinic, Inc.*, No. CIV. A. 94-7210, 1995 WL 424906, at *7 (E.D. Pa. July 19, 1995) (finding that a private hospital was not a state actor under the Supreme Court's close nexus test, government/state compulsion test, public/government function test, or symbiotic relationship test because (1) the only conduct connecting the hospital to the state was the hospital's compliance with the MHPA, (2) nothing in the MHPA "compels or encourages involuntary commitments," (3) "the commitment of the mentally ill has not been a traditional and exclusive function of the Commonwealth," and (4) "there was no interdependence between the private defendants and the Commonwealth").

Numerous courts in this Circuit have cited *Janicsko* with approval and followed its lead. *See, e.g.*, *Carver v. Plyer*, 115 F. App'x 532, 538–639 (3d Cir. 2004) ("In *Janicsko v. Pellman*, 774 F. Supp. 331, 337–38 (M.D. Pa. 1991), *aff'd.* 970 F.2d 899 (3d Cir.1992), which we recently cited with approval . . . , the court held that although the MHPA contains language which states that a mental health professional 'shall' treat an individual if it is determined that emergency treatment is necessary, the actual determination of whether treatment is necessary is sufficiently discretionary so as not to compel any particular action.  We [previously] adopted this reasoning and accordingly hold that St. Luke's [Hospital] was not compelled by the MHPA to commit and treat Carver and cannot therefore be considered a state actor in this case." (internal citation omitted)); *Guilday*, 2022 WL 612865, at *6 ("The express language of the MHPA . . . leaves the decision whether to examine or treat individuals involuntarily to the discretion of the examining physicians . . . .  For the reasons stated above, Plaintiff cannot sue the Crozer-Chester Defendants for constitutional violations under Section 1983 because their actions cannot be 'fairly attributed' to the Commonwealth."); *Kush v. Bayview Loan Servicing*, Civil Action No. 3:18-1483, 2019 WL 2387081, at *2 (M.D. Pa. June 6, 2019) ("Additionally, insofar as plaintiff alleges that WB Hospital violated her constitutional rights by having her involuntarily committed for 20 days, the law is clear that hospitals who exam and treat persons suspected of being 'severely mentally disabled and in need of immediate treatment,' pursuant to Sections 302 and 303 of the MHPA, are not state actors for purposes of a claim under § 1983.") *Davenport v. Pottstown Hosp. Co., LLC*, Civil Action No. 17-1616, 2017 WL 3038254, at *6 (E.D. Pa. July 18, 2017) ("Mr. Davenport does not allege the Hospital acted under color of state law when it allegedly failed to train/supervise its employees because the [MHPA] does not coerce the Hospital to train or supervise its employees.  Mr. Davenport fails to state a *Monell* claim against the Hospital

because we have no facts showing the Hospital is a state actor."); *Savacool v. Del. Cnty. Dep't of Mental Health & Mental Retardation*, Civ. A. No. 92-2142, 1993 WL 21209, at *2–6 (E.D. Pa. Jan. 25, 1993) ("This court similarly finds that the Lankenau Hospital Defendants were not acting as state agents in the involuntary commitment of Joan Savacool."). *But see Schorr v. Borough of Lemoyne*, 265 F. Supp. 2d 488, 491–96 (M.D. Pa. 2003) (denying summary judgment on § 1983 claims against private hospital and finding, under the close nexus test, that the hospital was a "state actor" because the plaintiffs "are not alleging state action solely on the basis of the statutory scheme [of the MHPA], but rather allege a complex relationship between" the hospital and the County).

We are persuaded by the reasoning of *Janicsko*, *Carver*, and similar opinions and find that Smith has failed to allege facts which suggest that MCES was a state actor when it transported Smith the hospital, evaluated her mental health, and discharged her. Because MCES was not acting under color of state law, the federal constitutional and statutory claims asserted against it pursuant to § 1983 fail and are dismissed with prejudice.

That leaves Smith's purported state law claims.[11] We find two possible state-law theories in the Complaint. First, although far from clear, Smith appears to assert a claim for false imprisonment under Pennsylvania law in addition to her Fourth Amendment unlawful seizure claim. To state a claim for false imprisonment, Smith must allege facts tending to show that she was detained and that her detention was unlawful. *See Campeggio v. Upper Pottsgrove Township*, Civil Action No. 14-1286, 2014 WL 4435396, at *6 (E.D. Pa. Sept. 8, 2014) ("In

---

[11] Section 1983 is not the proper vehicle for asserting violations of state law. *Benn v. Univ. Health Sys., Inc.*, 371 F.3d 165, 173–74 (3d Cir. 2004) ("Section 1983 does not provide a cause of action for violations of state statutes." (quoting *Brown v. Grabowski*, 922 F.2d 1097, 1113 (3d Cir. 1990)). Therefore, we analyze Smith's state-law theories as independent claims.

Pennsylvania, false arrest and false imprisonment are essentially the same torts, both requiring unlawful detention.").  But here, the facts as alleged show that Smith's brief detention in the ambulance and then at MCES was not unlawful because it was based on a facially valid 302 Warrant issued pursuant to state law.  *Cf. Doby*, 1996 U.S. Dist. LEXIS 13175, at *83 (dismissing false arrest claim against police officers who executed a 302 warrant because they "were serving a facially valid warrant on Rebecca Doby such that they cannot be held liable for a false arrest claim based on the Fourth Amendment").[12]  Because Smith was lawfully detained for an evaluation under the MHPA, her false imprisonment claim fails.[13]

Second, Smith asserts a claim for violation of the "[c]ommon law right to refuse medical treatment," asserting that "MCES failed to advise the plaintiff of her right to refuse medical treatment including diagnostic treatment (an invasive mental evaluation) immediately upon execution of a PA 302 Law warrant."  (Doc. No. 1 at pp. 8–9.)  Pennsylvania courts have recognized that the "right to refuse medical treatment is deeply-rooted in the common law of Pennsylvania."  *In re D.L.H.*, 967 A.2d 971, 985 (Pa. Super. Ct. 2009); *see also In re Fiori*, 673 A.2d 905, 909 (Pa. 1996) ("The right to refuse medical treatment has deep roots in our common law.").  "Nonetheless, like so many other rights, the personal right of self-determination is not absolute" and "must be balanced against the interests of the state."  *In re D.L.H.*, 967 A.2d at 985.  "The four state interests most commonly recognized by courts are:  [1] protection of third parties; [2] prevention of suicide; [3] protection of the ethical integrity of the medical

---

[12] "A false arrest claim under Pennsylvania law is 'coextensive' with a Fourth Amendment false-arrest claim."  *Dillon v. Munley*, Civil Action No. 3:19-CV-01216, 2019 WL 5488449, at *6 (M.D. Pa. Oct. 8, 2019).

[13] Because Smith's false imprisonment claim fails, so too does her claim that MCES "falsely billed the plaintiff's health insurance for their false imprisonment of the plaintiff (involuntarily strapped onto a gurney and locked into [an MCES] ambulance) while under guard by 2 Cheltenham police officers."  (Doc. No. 1 at p. 8.)

community; and [4] preservation of life." *In re Fiori*, 673 A.2d at 910.  The MHPA implicates

the first and second of these interests, authorizing "[e]mergency examination" where there are

"reasonable grounds to believe a person is severely mentally disabled and in need of immediate

treatment" because "he poses a clear and present danger of harm to others or to himself."  50 Pa.

Stat. & Cons. Stat. §§ 7301(a), 7302(a).

In light of these significant state interests, we find that § 302(a)(1) represents a

reasonable intrusion into an individual's right to refuse medical treatment.  Indeed, the case

before us shows that the statute includes numerous procedural safeguards to ensure the intrusion

is warranted and represents the least restrictive alternative:  Here, Smith was taken to MCES for

a mental evaluation after an unbiased county delegate found that she posed a clear and present

danger of harm to her neighbors.  Smith was evaluated within a few hours of arriving at MCES

and then released.  While waiting to leave MCES, a nurse asked Smith if she would agree to

voluntarily receive mental treatment, but Smith declined and refused to sign the referral form.

(*See* Doc. No. 79-1 at p. 19.)  There is no allegation that MCES acted against this wish or

otherwise compelled Smith to partake in any medical evaluations or treatments once it

determined that she was not a danger to herself or others.  Because her detention was reasonable

and conducted in accordance with § 302(a)(1), we cannot find MCES violated Smith's right to

refuse medical treatment.

For those reasons, Smith's claims against MCES under § 1983 and state law are

dismissed with prejudice.

### 4.     Tina Pergine

Fourth, Smith argues that Tina Pergine, the MCES employee and county delegate who

issued the 302 Warrant, acted with "gross negligence," and violated Smith's Fourth Amendment

rights when she issued the 302 Warrant despite "the fact that there was no clear and convincing

evidence contained in the said 302 [A]pplication that [Smith] represented a danger to herself or others."  (Doc. No. 1 at p. 10.)

The MHPA provides immunity for authorized individuals who "participate[ ] in a decision that a person be examined or treated under this Act."  50 Pa. Stat. & Cons. Stat. § 7114(a).  "In the absence of willful misconduct or gross negligence, a county administrator, a director of a facility, a physician, a peace officer or any other authorized individual . . . shall not be civilly or criminally liable for such decision or for any of its consequences."[14]  *Id.* "Pennsylvania law defines gross negligence in the context of the MHPA as 'facts indicating more egregiously deviant conduct than ordinary carelessness, inadvertence, laxity or indifference.'" *Doby*, 171, F.3d at 875 (quoting *Albright v. Abington Mem. Hosp.*, 696 A.2d 1159, 1164 (Pa. 1997)).  "The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care."  *Id.* (quoting *Albright*, 696 A.2d at 1164).  And a person engages in willful misconduct "when 'the danger to the plaintiff, though realized, is so recklessly disregarded that, even though there be no actual intent, there is at least a willingness to inflict injury, a conscious indifference to the perpetration of the wrong.'"  *Id.* (quoting *Krivijanski v. Union R.R. Co.*, 515 A.2d 933, 937 (Pa. Super. Ct. 1986)).

Smith claims that Pergine acted with gross negligence when she issued the 302 Warrant because the 302 Application "fails to show any clear and convincing evidence that the plaintiff represented a danger to herself or others," and was "completely untrue, nonsense, here say [sic] and not supported by any facts and does not meet PA 302 Law standard for issuance of a 302

---

[14] Although we do not analyze Smith's claims against Broadnax at length in this opinion, we note that she too is entitled to immunity for her application statement absent a showing that her actions amounted to "willful misconduct or gross negligence."  *See Doby*, 171 F.3d at 873 (concluding that the "individual who applies for a section 7302 warrant can be deemed to be a participant in the decision-making process to involuntarily examine the patient," and therefore, he or she, "like a peace officer, qualifies for immunity under section 7114 unless he engaged in willful misconduct or gross negligence").

warrant." (Doc. No. 79-1 at p. 10.) We disagree. A county delegate may accept the allegations in a 302 application and need not independently verify their validity. *See Doby*, 171 F.3d at 871, n.5 ("The MHPA clearly permits seizures of mentally ill individuals without requiring county officials to apply to a magistrate for a warrant that would be issued only upon probable cause. Instead, the statute creates an alternative warrant scheme."); *Guilday*, 2022 WL 612865, at *10 ("Under this alternative scheme county officials are not required to independently verify the facts asserted by the petitioner before issuing a warrant for emergency examination.").

And contrary to Smith's assertions, nothing in § 302(a)(1) requires an applicant to personally observe the conduct at issue. A review of § 302(a) shows that the personal observation requirement applies only when someone is taken for emergency examination *without* a warrant pursuant to subsection two:

> (2) Emergency Examination Without a Warrant.--*Upon personal observation* of the conduct of a person constituting reasonable grounds to believe that he is severely mentally disabled and in need of immediate treatment, and physician or peace officer, or anyone authorized by the county administrator may take such person to an approved facility for an emergency examination. Upon arrival, he shall make a written statement setting forth the grounds for believing the person to be in need of such examination.

50 Pa. Stat. & Cons. Stat. § 7302(a)(2) (emphasis added). By contrast, subsection one includes no such requirement and states that the county administrator may issue a warrant for emergency examination "[u]pon written application by a physician or other responsible party setting forth facts constituting reasonable grounds to believe a person is severely mentally disabled or in need of immediate treatment." *Id.* § 7302(a)(1). Those "facts" need not be personally observed by the applicant and may be based on hearsay. *See In re J.M.*, 726 A.2d 1041, 1048 n.10 (Pa. 1999) ("It seems clear that if the legislature provided that hearsay statements could be considered in the determination of whether involuntary treatment should be extended to up to twenty days, the

23

legislature did not intend to exclude consideration of hearsay from an application for a warrant to take a person to a doctor for an emergency mental health evaluation.").

Here, Broadnax's application satisfies subsection one.  She stated that:

> Susanne [sic] Smith has been calling the police and stating we are sending electrical beams through the ceiling to harm her.  Has been recording conversations in my home through a hole in the floor.  Has been standing outside my door listening to us.  Is telling police that we have a private detective watching her.  Was filming me this morning, 6/26/21 as I left for work.  Keeps trying to turn my doorknob.  She does these things after I leave out of my home when my daughter is home alone with her kids.  I work at Friends Hospital and she is having paranoid delusions and I feel that she may act on it.

(Doc. No. 68-2 at pp. 3–4.)  Upon receipt of this application from a self-identified mental health worker, a reasonable county delegate in Pergine's position could find that Broadnax believed Smith was suffering from "paranoid delusions," including the delusion that Broadnax and her family were "sending electrical beams through the ceiling to harm" Smith and had hired a private detective to watch her.  The application also suggests an escalation in behavior, attesting that Smith recorded and filmed the Broadnax family, called the police to report them, and repeatedly tried to enter the Broadnax apartment after Karen Broadnax left for work.

Taking these allegations as true and considering them together, Pergine had "reasonable grounds" for finding that Smith may be a danger to the Broadnax family, such that she could be involuntarily detained for the short period of time required to perform a mental evaluation.  And because Pergine "possessed sufficient information to make a reasonable determination that plaintiff was in need of treatment," she was "at maximum . . . negligent" when she issued the 302 Warrant.  *See Mervan v. Darrell*, Civ. A. No. 93-CV-4552, 1995 WL 262543, at *8 (E.D. Pa. Apr. 27, 1995).

She is, therefore, entitled to immunity under § 114.  *See Uram v. County of Allegheny*, 567 A.2d 753, 756 (Pa. Commw. Ct. 1989) ("Contrary to Appellant's argument, the warrant

application demonstrates that Tosic [the county administrator] had information which could lead her to believe that Appellant threatened suicide and committed acts in furtherance of suicide within 30 days preceding the warrant.  With the information available to her, Tosic's authorization of the warrant at a maximum was negligent, and as a matter of law was not willful misconduct."); *Mervan*, 1995 WL 262543, at *8 ("At a maximum the actions of defendant social workers and police officers in detaining plaintiff [pursuant to the MHPA] were negligent and, as a matter of law, did not evidence willful misconduct or gross negligence.  As such, defendant social workers and police officers are entitled to immunity.").

Because Pergine is immune from suit under § 114, the claims against her are also dismissed with prejudice.

*      *      *

In sum, we dismiss Smith's initial Complaint with prejudice as against the Commonwealth, the Township, MCES, and Pergine.

## IV.    MOTION TO AMEND

Because we are dismissing all of the claims in the initial Complaint against the Commonwealth, the Township, MCES, and Pergine, Smith's motion to file the Amended Complaint must be denied to the extent it attempts to reassert those dismissed claims.  The remainder of Smith's Amended Complaint seeks to:  (1) add claims for defamation against MCES, Pergine, and Broadnax, along with a related request for monetary relief, and (2) add Montgomery County as a Defendant on the grounds that the County is liable as Pergine's employer.  We address each request in turn.

### A.    *Legal Standard*

A motion to file an amended pleading is governed by Federal Rule of Civil Procedure 15, which allows a party to "amend its pleading once as a matter of course within 21 days after

25

serving it, or . . . 21 days after service of a responsive pleading or 21 days after service of a

motion under Rule 12(b), (e), or (f), whichever is earlier."  Fed. R. Civ. P. 15(a)(1).  "In all other

cases, a party may amend its pleading only with the opposing party's written consent or the

court's leave," which should be freely given "when justice so requires."  Fed. R. Civ. P. 15(a)(2).

The burden is on the party opposing the amendment, and the "touchstone of the rule is a showing

of prejudice" to the opposing party.  *Price v. Trans Union, LLC*, 737 F. Supp. 2d 276, 279 (E.D.

Pa. 2010).  "In the absence of substantial or undue prejudice, denial [of a motion to amend] must

be grounded in bad faith or dilatory motives, truly undue or unexplained delay, repeated failure

to cure deficiency by amendments previously allowed or futility of amendment."  *Heyl &*

*Patterson Int'l, Inc. v. F.D. Rich Hous. of the V.I., Inc.*, 663 F.2d 419, 425 (3d Cir. 1981).

"Futility of amendment occurs when the complaint, as amended, does not state a claim upon

which relief can be granted."  *Jones v. Crisis Intervention Servs.*, 239 F. Supp. 3d 795, 800 (D.

Del. 2017); *see also Harrison Beverage Co. v. Dribeck Importers, Inc.*, 133 F.R.D. 463, 468

(D.N.J. 1990) (explaining that when a proposed amendment is "frivolous or advances a claim or

defense that is legally insufficient on its face, the court may deny leave to amend").  In other

words, "amendment is futile if the amended complaint would not survive a motion to dismiss for

failure to state a claim upon which relief could be granted."  *Alvin v. Suzuki*, 227 F.3d 107, 121

(3d Cir. 2000).

   **B.**  ***Discussion***

   As mentioned above, Smith has filed numerous amended pleadings since filing her initial

Complaint.  *See supra* n.6.  Therefore, to file the most recently filed Amended Complaint (Doc.

No. 79-1), Smith must seek the Court's leave.  Here, Smith looks to add:  (1) claims for

defamation against MCES, Pergine, and Broadnax, along with a related request for monetary

relief, and (2) Montgomery County as a Defendant on the grounds that the County is liable as Pergine's employer.  We address each request in turn.

### 1.  Defamation Claims

"Defamation, of which libel, slander, and invasion of privacy are methods, is the tort of detracting from a person's reputation, or injuring a person's character, fame, or reputation, by false and malicious statements." *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 476 (E.D. Pa. 2010). To state a claim for defamation, a plaintiff must allege facts tending the show:

> (1) The defamatory character of the communication.
>
> (2) Its publication by the defendant.
>
> (3) Its application to the plaintiff.
>
> (4) The understanding by the recipient of its defamatory meaning.
>
> (5) The understanding by the recipient of it as intended to be applied to the plaintiff.
>
> (6) Special harm resulting to the plaintiff from its publication.
>
> (7) Abuse of a conditionally privileged occasion.

42 Pa. Stat. & Cons. Stat. § 8343(a); *Tuman v. Genesis Assocs.*, 894 F. Supp. 183, 190 (E.D. Pa. 1995) ("To state a claim for defamation, a plaintiff must allege (1) a defamatory communication; (2) pertaining to the plaintiff; (3) published by the defendant to a third party; (4) who understood that the communication pertained to the plaintiff and had a defamatory meaning; and (5) that resulted in plaintiff's injury.").[15]

---

[15] In the Amended Complaint, Smith brings her defamation claim pursuant to 28 U.S.C. § 4101. (*See* Doc. No. 79-1 at pp. 9, 11, 12.)  But § 4101 is a federal statute relating to recognition of foreign defamation judgments.  *See* 28 U.S.C. §§ 4101 (defining "defamation" for purposes of the Act), 4102 (limiting the enforceability of a foreign judgment for defamation in a domestic court).  It does not create a federal cause of action for defamation.

Smith alleges that MCES defamed her "by executing a false 302 warrant against the plaintiff that did not meet the requirements of the [MHPA]," and in doing so, "falsely cast the plaintiff as a mentally ill person." (Doc. No. 79-1 at p. 9.) Likewise, Smith alleges that Pergine, as an employee of MCES and the assigned delegate for Montgomery County, defamed her when she "approv[ed] a false 302 warrant against the plaintiff, that did not meet the requirement[s] of [the MHPA]." (Doc. No. 79-1 at p. 11.) These claims fail because as discussed above, Smith has failed to allege any facts suggesting the 302 Warrant was "false," and in any event, Pergine is immune from civil liability under § 7114. Because Smith cannot pursue a claim against Pergine, it likewise cannot pursue a claim against her employer, MCES. *See Hoffenberg v. United States*, Civil Action No. 12–4833 (JBS/AMD), 2013 WL 135134, at *2 (D.N.J. Jan. 8, 2013) ("Respondeat superior claims must fail where, as here, the underlying tort claims have been dismissed.").

Broadnax is a closer call. Smith alleges that Broadnax has "repeatedly made crazy-sounding, false allegations against the plaintiff so as to falsely cast the plaintiff as a mentally ill person." (Doc. No. 79-1 at p. 12.) Although Smith does not identify a specific defamatory statement, we assume she is referring to the statement in Broadnax's 302 Application. When viewed in context, however, we find this statement was not defamatory as a matter of law.

"Procedurally, a trial court at the outset should decide whether a statement is capable of a defamatory meaning." *Graboff v. Colleran Firm*, 744 F.3d 128, 135–36 (3d Cir. 2014). "A statement is defamatory if 'it tends to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Id.* at 136 (quoting *Tucker v. Fischbein*, 237 F.3d 275, 282 (3d Cir. 2001)); *see also Garvey v. Dickinson Coll.*, 761 F. Supp. 1175, 1188 (E.D. Pa. 1991) ("The plaintiff establishes defamatory

character by showing that the statement in question tends to harm her reputation, lower her in the estimation of the community, or deter other persons from associating or dealing with her in a professional or business relationship."); *Tucker v. Phila. Daily News*, 848 A.2d 113, 126 (Pa. 2004) ("The question for us is whether the statements of Appellant-newspapers tended to harm the reputation of the Tuckers so as to tarnish their reputation and expose them to public hatred, contempt or ridicule." (quotation marks omitted)); *cf. Feldman v. Lafayette Green Condo. Ass'n*, 806 A.2d 497, 500–01 (Pa. Commw. Ct. 2002) ("A libel is a maliciously written publication that tends to blacken a person's reputation or expose her to public hatred, contempt or ridicule.").

"In determining whether a communication is defamatory, the court must view the statement 'in context' with an eye toward 'the effect [it] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.'" *Remick v. Manfredy*, 238 F.3d 248, 261 (3d Cir. 2001) (quoting *Baker v. Lafayette Coll.*, 532 A.2d 399, 402 (Pa. 1987)).  Context is key to this determination because "[w]ords which standing alone may reasonably be understood as defamatory may be so explained or qualified by their context as to make such an interpretation unreasonable." *Tucker* , 848 A.2d at 124; *see also id.* at 126 ("The question for us is whether the statements of Appellant-newspapers tended to harm the reputation of the Tuckers so as to tarnish their reputation and expose them to public hatred, contempt or ridicule." (quotation marks omitted)); *Feldman*, 806 A.2d at 500  ("[W]e view the statement in its factual context, because the key in determining defamatory meaning is the effect the statement would produce on its intended audience.").

This case is a prime example for why context matters.  Here, Broadnax's 302 Application states:

> Susanne [sic] Smith has been calling the police and stating we are sending electrical beams through the ceiling to harm her.  Has been recording

> conversations in my home through a hole in the floor.  Has been standing
> outside my door listening us.  Is telling police that we have a private
> detective watching her.  Was filming me this morning, 6/26/21 as I left for
> work.  Keeps trying to turn my doorknob.  She does these things after I leave
> out of my home when my daughter is home alone with her kids.  I work at
> Friends Hospital and she is having paranoid delusions and I feel that she
> may act on it.[16]

Had this statement been published in a newspaper, told to Smith's neighbors, or sent to Smith's

coworkers, then Smith would have clearly alleged that it was defamatory.  But here, the

Amended Complaint alleges that Broadnax submitted the 302 Application *only* to Pergine, the

county administrator tasked with issuing 302 warrants, and that the only individuals who saw the

302 Application were Pergine and the physician who evaluated Smith.  Smith has not

demonstrated any facts suggesting a risk that Broadnax's allegations or the associated medical

documents would have been publicly accessible or capable of tarnishing Smith's reputation in

the community.  *See Burton v. Teleflex Inc.*, 707 F.3d 417, 434 (3d Cir. 2013) ("The statement

must be examined in context to determine its likely effect on the reader, and the Court should

evaluate the effect it is likely to produce 'in the minds of the average persons among whom it is

intended to circulate.'"); *Tucker*, 848 A.2d at 126 ("The question for us is whether the statements

of Appellant-newspapers tended to harm the reputation of the Tuckers so as to tarnish their

reputation and expose them to public hatred, contempt or ridicule." (quotation marks omitted)).

Indeed, because Smith is subject to an almost immediate evaluation by a trained professional, we

question whether Smith has plausibly suggested that Pergine would take it as a definitive

statement of Smith's danger to herself or others.  *Contra Tucker*, 848 A.2d at 126 (finding that

---

[16] This last clause is a statement of opinion.  Statements of opinion are not actional in defamation. *See Scott v. Lackey*, CIVIL ACTION NO. 1:02-CV-1586, 2007 WL 9761643, at *4 (M.D. Pa. Dec. 10, 2007) ("[P]ure statements of the defendant's opinion, no matter how offensive to the plaintiff, do not constitute actionable defamation.").

the complaint "albeit barely, alleges that the statements are capable of a defamatory meaning" because the plaintiff asserted that the defendant newspapers published articles that "held them out for ridicule in the world").

Because the Amended Complaint fails as a matter of law to state a claim for defamation against MCES, Pergine, or Smith, amendment as to this claim would be futile.

### 2.   Montgomery County

Second, Smith moves to add Montgomery County as a Defendant on the grounds that "Defendant Tina L. Pergine, in her capacity as a Montgomery County Delegate, is a part-time employee of Montgomery County, Pennsylvania." (Doc. No. 59 at p. 1.)  Smith argues that "if Tina L. Pergine was acting for Montgomery County, Pennsylvania then Montgomery County should bear the same burden of charges made against Tina L. Pergine." (*Id.* at p. 2.)  This is essentially a claim for *respondeat superior* liability, which cannot serve as a basis for a § 1983 claim against a local government. *See Monell*, 436 U.S. at 692 ("[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory.").  And even if Smith could state a claim based solely on *respondeat superior*, that claim would fail because we have dismissed all claims against Pergine.

\*      \*      \*

For those reasons, Smith's motions to amend the complaint to add claims for defamation and to add Montgomery County as a defendant are denied.

## V.   REMAINING CLAIMS AND MOTIONS

After granting Defendants' motions to dismiss and denying Smith's motions to amend, the only remaining claims are her state law claims against Broadnax for malicious prosecution, abuse of process, filing a false affidavit, and filing a false 302 Application. (Doc. No. 1 at pp. 12–13.)  The Court declines to exercise supplemental jurisdiction over these state-law claims.

*Davis v. Abington Mem. Hosp.*, 817 F. Supp. 2d 556, 568 (E.D. Pa. 2011) ("The only claims remaining (Counts 5 through 18) are based on Pennsylvania law.  Although federal courts with original jurisdiction over a federal claim have supplemental jurisdiction over state claims that form 'part of the same case or controversy,' a court may decline to exercise supplemental jurisdiction over state law claims if 'the district court has dismissed all claims over which it has original jurisdiction.'  It is appropriate to decline the exercise of supplemental jurisdiction if the litigation is in its early stages, and where the complaint asserts federal question jurisdiction.").  Therefore, these claims are dismissed without prejudice to Smith's right to assert these claims in state court.

Because we decline to exercise continued jurisdiction over Smith's initial Complaint, we also deny Broadnax's request for counsel as moot.

## VI.    CONCLUSION

In sum, the motions to dismiss the initial Complaint are granted and Smith's claims against the Commonwealth, the Township, MCES, and Pergine are dismissed with prejudice.  Smith's motions to amend the Complaint are denied because amendment would be futile.  The remaining state-law claims in the initial Complaint are dismissed without prejudice.  Finally, Broadnax's motion for appointment of counsel is denied as moot.  An appropriate order follows.